IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRIAN FRANK GUERRY, | |
| Plaintiff, | **8:15CV323** |
| vs. | |
| SCOTT FRAKES, Director; BRIAN GAGE, Warden; GUIFFRE, Case Worker; and THOMPSON, Case Worker; | **MEMORANDUM AND ORDER** |
| Defendants. | |
| BRIAN FRANK GUERRY, | **4:17CV3047** |
| Plaintiff, | |
| vs. | |
| SCOTT FRAKES, in his individual capacity; FRANK HOPKINS, in his individual capacity; BRIAN GAGE, in his individual capacity; et al.; | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the court on the Defendants'[1] Motion for Summary Judgment. (Filing No. 88, Case No. 8:15CV323; Filing Nos. 41, 46, Case No. 4:17CV3047.) For the reasons that follow, the Motion is granted.

---

[1] "Defendants" are:
(continued on next page)

# I.  BACKGROUND

Plaintiff Brian Frank Guerry ("Guerry") filed the action in Case No. 8:15CV323 on September 15, 2015, pursuant to 42 U.S.C. § 1983 against the Nebraska Department of Correctional Services ("NDCS") and prison officials in their official and individual capacities, alleging violations of his constitutional rights and state law negligence claims arising out of the May 10, 2015, riot at Tecumseh State Correctional Institution ("TSCI"). (Filing No. 1.)[2]

---

•  Case No. 8:15CV323: Scott Frakes (Director of NDCS), Brian Gage (Warden of TSCI), Chelsea Guiffre (unit manager at TSCI), and Daniel Thompson (case worker at TSCI), each in his or her individual capacity.

•  Case No. 4:17CV3047: Frakes, Gage, Guiffre, Thompson, Frank Hopkins (Assistant Director of NDCS), Michelle Capps (Deputy Warden of TSCI), Scott Busboom (Associate Warden of TSCI), Christopher Connelly (captain at TSCI), Crystal Rempel (yard supervisor at TSCI), Jacob Bents (corporal at TSCI), Austin Gocke (corporal at TSCI), Shawn Sherman (unit administrator at TSCI), Christopher Ulrick (shift supervisor/sergeant/lieutenant at TSCI), Keith Broadfoot (unit manager at TSCI), Ryan Holley (case manager at TSCI), Sarah Flynn (safety instructor at TSCI), Paul Tompkins (case manager at TSCI), Lucas A. Roede (correction officer at TSCI), Adam B. Cropp (TSCI staff), Sarah E. Glass (TSCI staff), Sonny Steele (correction officer at TSCI), and Andrew King (corporal at TSCI), each in his or her individual capacity.

The names reflect the correct spelling of Defendants' names. Some spellings differ from Guerry's spellings.

[2] All references in this brief to CM/ECF docket entries are to filings in Case No. 8:15CV323 (i.e., the "Lead Case"), unless otherwise specified.

Guerry alleges that he resided in the protective custody unit of TSCI on May 10, 2015.[3] Guerry claims he resided in the protective custody unit because he is a sex offender and fears violence from gangs within general population based on an assault he suffered from them in 2013. (*Id.* at CM/ECF p. 4.)

At approximately 4:00 p.m. on this date, Guerry began to suffer from smoke inhalation. He called officers in the unit's "control bubble" for help. At this time, the control bubble was staffed by three jail officials, including Chelsea Guiffre ("Guiffre"), a unit manager, and Daniel Thompson ("Thompson"), a case worker. Guerry alleges that Guiffre and Thompson remotely opened some cell doors in the unit, but not others. Guerry's cell door was among those opened. (*Id.*)

Guerry exited his cell and called out for help, but Guiffre and Thompson were no longer in the control bubble. (*Id.*) He proceeded to go to the "small yard," where prison staff had instructed protective-custody inmates to go during a fire, but the door to the small yard was locked. Instead, Guiffre and Thompson had unlocked the door to the "Bigger fence in area yard," which allowed general-population inmates, including gang members, to enter the unit. (*Id.* at CM/ECF pp. 5, 13.) For the next nine or so hours, general population inmates entered the protective-custody unit, harassed protective-custody inmates, and started fires. The general population inmates had access to the control bubble. During this time, Guerry and ten other inmates locked themselves into a cell. Guerry alleges that he suffered approximately 10 hours of smoke inhalation. (*Id.* at CM/ECF pp. 6-7.) Law enforcement arrived at approximately 2:00 a.m. the following morning and provided assistance. (*Id.* at CM/ECF p. 7.)

---

[3] Guerry no longer resides at TSCI and is now confined at the Omaha Correctional Center.

Guerry alleges prison staff immediately returned him to his cell and did not treat him for smoke inhalation. Following the prison riot, Guerry "ask[ed] for days to be seen by medical," but he was advised there would be no inmate movement. Finally, on June 3, 2015, Guerry received medical attention. (*Id.*)

Guerry filed grievances with prison officials. (*Id.* at CM/ECF pp. 17-20.) The following response is attached to Guerry's Complaint:

> You contend while housed at Tecumseh State Correctional Institution (TSCI) that during the May 10, 2015 TSCI disturbance, TSCI staff failed to protect Protective Custody inmates by abandoning their posts and leaving Protective Custody inmates to be victimized by General Population inmates. During the time period you mention in your Grievance, TSCI staff was busy working through a significant emergency situation. TSCI inmate and staff safety was an area of primary concern during the entire period surrounding the May 10, 2015 disturbance. The May 10, 2015 TSCI disturbance ultimately impacted all aspects of facility operations in some way. TSCI staff made every effort to provide the best environment possible considering the circumstances and difficulties created by the May 10, 2015 incident.

(*Id.* at CM/ECF p. 20.)

Guerry complains he suffered various injuries as a result of the prison riot. He alleges his injuries were a result of Frakes' and Gage's negligence, deliberate indifference, and failure to train Guiffre and Thompson. In addition, he alleges that Guiffre and Thompson were deliberately indifferent to a known risk of serious harm when they abandoned their post in the control bubble during the riot. Guerry sought declaratory, injunctive, and monetary relief in this matter. (*Id.* at CM/ECF pp. 13-16.)

After initial review of the Complaint and Defendants' Motion to Dismiss (Filing No. 24), the court determined that Guerry's Eighth Amendment failure-to-

protect claims for monetary relief could proceed against Defendants Frakes, Gage, Guiffre, and Thompson in their individual capacities.[4] (Filing Nos. 13, 33.) The court dismissed Guerry's state law claims against the prison officials in their official capacities without prejudice to reassertion in state court.[5] (Filing No. 33, at CM/ECF p. 6.)

On February 15, 2017, Guerry filed a suit in state district court ("the state court action") specifically invoking the Nebraska State Tort Claims Act ("STCA"), Neb. Rev. Stat. §§ 81-8,209, et seq., as well as federal claims similar to those brought in Case No. 8:15CV323. (*See* Filing No. 1-1, Case No. 4:17CV3047.) In addition, Guerry alleged that that Defendants failed to move him out of his cell where he was exposed to burning plastic, oily water contaminated with blood, human waste, and sewage for four or more days following the prison riot, and that his blankets, sheets, and bed contained blood of another inmate for a similar amount of time, during which time he had to eat and sleep in those conditions. (*Id.*)

Subsequently, on April 7, 2017, Defendants filed a Notice of Removal in Case No. 4:17CV3047, removing the state court action. (Filing No. 1, Case No. 4:17CV3047.) The court remanded Guerry's state law claims and consolidated Case Nos. 8:15CV323 and 4:17CV3047 with respect to Guerry's federal claims.

---

[4] Guerry initially named Broadfoot and Holley as Defendants in Case No. 8:15CV323. The court, however, determined that Guerry did not state plausible claims for relief against either of them. Guerry alleged Broadfoot is a unit manager and Holley is a case manager. He did not allege these individuals were working on the day of the riot or that they had any responsibility whatsoever for his safety and security on the day of the riot. (Filing No. 13 at CM/ECF p. 5.)

[5] The court also dismissed claims against NDCS, state law claims against the prison officials in their individual capacities, Eighth Amendment claims against the prison officials in their official capacities, and claims for declaratory and injunctive relief. (Filing No. 33 at CM/ECF pp. 5-6.)

([Filing No. 74](#).) The court thereafter determined that Guerry's Eighth Amendment failure-to-protect claims and conditions-of-confinement claims could proceed against Defendants[6] in their individual capacities for monetary damages. ([Filing No. 76](#).) The court dismissed Guerry's Eighth Amendment deliberate indifference to serious medical needs claim and his equal protection claim. ([Filing No. 76 at CM/ECF p. 4](#), [6](#).)

Defendants have filed a Motion for Summary Judgment asserting that they are entitled to qualified immunity and judgment as a matter of law on all remaining claims against them. ([Filing No. 88](#); [Filing Nos. 41](#), [46](#), Case No. 4:17CV3047.) Along with their Motion, Defendants filed an Index of Evidence and Brief in Support. ([Filing Nos. 89](#), [90](#).) Guerry filed a Brief in Opposition to Defendants' Motion for Summary Judgment and an Index of Evidence. ([Filing Nos. 94](#), [95](#).) After Defendants filed a Reply Brief ([Filing No. 96](#)), Guerry filed an Amended Brief in Opposition and an Amended Index of Evidence. ([Filing Nos. 104](#), [105](#).)

## II.  RELEVANT UNDISPUTED MATERIAL FACTS[7]

---

[6] Guerry's Eighth Amendment failure-to-protect claims are pending against all Defendants *except* Broadfoot and Holley. (*See* [Filing No. 76 at CM/ECF p. 3](#); [Filing No. 85 at CM/ECF p. 2](#).)

[7] Defendants have complied with the court's local rule by including in their supporting brief ([Filing No. 89 at CM/ECF pp. 2-16](#)) "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR [56.1](#)(a). Because Guerry has not submitted a brief containing a concise response to Defendants' statement of material facts, which contains proper references to the record, all of the facts stated are deemed admitted. *See* NECivR [56.1](#)(b)(1). Although Guerry appears pro se, he is "bound by and must comply with all local and federal procedural rules." NEGenR [1.3](#)(g); *see also Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (per curiam) (concluding pro se (continued on next page)

1.      At all relevant times, James Jansen ("Jansen") was employed as Major at TSCI. He was employed in that capacity at TSCI on May 10, 2015, and was present at the facility and part of the TSCI command structure at all relevant times during the inmate disturbance on May 10, 2015. ([Filing No. 90-2 at CM/ECF pp. 1-2](#), ¶¶ 2, 4.)[8]

2.      At all relevant times, Guiffre was employed as a Case Worker at TSCI. She was employed in that capacity on May 10, 2015, and was present at the facility with her work assignment being Housing Unit 2, Gallery[9] C. ([Filing No. 90-3 at CM/ECF p. 1](#), ¶¶ 2-3.)

3.      Thompson is employed as a Case Worker at TSCI. However, Thompson was not scheduled to work at TSCI on May 10, 2015, nor was he present at the facility that day. He was not among the correctional officers who were involved with or who responded to the inmate disturbance that began at TSCI during the afternoon of May 10, 2015. ([Filing No. 90-4 at CM/ECF p. 1](#), ¶¶ 2-3.)

---

litigants are not excused from compliance with procedural and local rules). The court does consider the facts alleged in Guerry's verified complaints ([Filing No. 1](#); [Filing No. 1-1](#), Case No. 4:17CV3047). *See [Spear v. Dayton's, 733 F.2d 554, 555-56 (8th Cir. 1984)](#)* ("[A] litigant, especially one unrepresented by counsel . . . is [not] under a duty to repeat his verified allegation in a new affidavit. . . . This is not, in other words, a case of a plaintiff who simply rested on the unverified allegations of his pleadings.").

[8] An aerial photograph showing the external layout of Housing Unit 2 has been authenticated by Jansen as Exhibit 1 to his declaration. ([Filing No. 90-2 at CM/ECF p. 7](#).)

[9] Jansen and Broadfoot use the technical term "gallery" to describe the four cell wings of Housing Unit 2, whereas Guiffre uses the shorthand "quad." The terms are interchangeable.

4.     On May 10, 2015, Guerry was housed in Housing Unit 2, Gallery C at TSCI. Gallery C housed protective custody inmates at the time of the disturbance. (Filing No. 90-2 at CM/ECF p. 2, ¶ 6; Filing No. 90-3 at CM/ECF p. 1, ¶ 4.)

5.     Within Housing Unit 2 there are two "control stations."[10] One control station serves Galleries A and B and the other serves Galleries C and D. From each control station, correctional officers can monitor their sectors of the unit, unlock individual cells, communicate with TSCI central control, and transmit an emergency duress signal, if necessary. TSCI central control and the unit-level control stations have the ability to authorize "group access" for multiple cells at the same time, unlocking the doors to selected cells and signaling to inmates that they may exit their cells and evacuate as instructed. "Unlock" in this context does not mean that a cell door is unlocked from both sides. Rather, it means the inmate may open the cell from the inside. If the inmate does not do so, the cell door remains locked from the outside. (Filing No. 90-2 at CM/ECF p. 2, ¶ 7; Filing No. 90-3 at CM/ECF p. 1, ¶ 5.)

6.     Beginning at approximately 2:30pm on May 10, 2015, and unfolding over the following several hours, a significant inmate disturbance occurred at TSCI. This disturbance affected virtually every aspect of operations at TSCI and included inmate violence in multiple locations and housing units, widespread inmate refusal to follow staff orders to lock down, the temporary forceful assumption of control of certain areas of the facility by inmates, physical threats to the safety of inmates and staff, actual assaults upon staff, and, ultimately, the deaths of two inmates. (Filing No. 90-2 at CM/ECF p. 2, ¶ 8.)

---

[10] Jansen and Guiffre variously use the terms "control station," "control center," or "control bubble." These terms appear to be interchangeable.

7.      TSCI was not understaffed on May 10, 2015 for regular operations. During the disturbance, additional NDCS staff resources than are ordinarily available at TSCI were necessary to subdue violent inmates and secure the facility. These additional resources included: (1) having TSCI personnel work additional hours and/or overtime; (2) NDCS special response team personnel from Lincoln; (3) the Nebraska State Patrol; and (4) Johnson County emergency personnel. These resources were summoned to TSCI during the disturbance as quickly as possible. (Filing No. 90-2 at CM/ECF pp. 2-3, ¶ 9.)

8.      Guiffre learned of the inmate disturbance at approximately 2:30 p.m. when she heard a radio call advising that emergency response was needed to deal with multiple inmate fights taking place in the main yard and that first and second responders were advised to proceed to the scene. (Filing No. 90-3 at CM/ECF p. 2, ¶ 6.)

9.      After hearing the radio call, Guiffre left Gallery C and went to the front door of Housing Unit 2 and looked into the yard. The other staff from Housing Unit 2 had responded to the fighting in the yard, so she remained in the housing unit to ensure that at least one staff member remained. After the initial fighting in the main yard subsided, two other Housing Unit 2 staff returned and Guiffre went back to Gallery C. (Filing No. 90-3 at CM/ECF p. 2, ¶ 7.)

10.     At approximately 3:00 p.m., Guiffre heard a radio call from TSCI central control advising staff to lock down all areas. Guiffre instructed inmates in Galleries C and D to lock down. Although several were argumentative, all inmates in Galleries C and D were successfully locked down shortly after 3:00 p.m. After these Galleries were locked down, Guiffre attempted to assist other staff secure non-rioting inmates in the yard and unsecured inmates in Gallery B. Guiffre, along with fellow Case Workers Steele and Thompkins, proceeded to the Gallery AB control station, where Corrections Officer Roede was in charge. (Filing No. 90-3 at CM/ECF p. 2, ¶ 8.)

11.     Between approximately 2:30 p.m. and 3:30 p.m., significant disruption occurred in Galleries A and B. Inmates in those Galleries initially refused to lock down when ordered. They proceeded to fashion makeshift weapons from mop/broom handles and fire extinguishers, to break through the sheetrock wall separating Galleries A and B, and to start fires inside those Galleries. (Filing No. 90-2 at CM/ECF p. 3, ¶ 10; Filing No. 90-3 at CM/ECF p. 2, ¶ 9.)

12.     One or more inmates attempted to cover security cameras with wet toilet tissue and the windows of the control station with sheets. Guiffre was able to stand on a counter inside the control station and observe inmate activity. Guiffre observed inmates use the metal legs off an ironing board to beat open the hole between Galleries A and B. Other inmates assisted in expanding that hole by stuffing paper, blankets, and toilet paper into the hole and then transferring a fire in a burning trash can to the material stuffed in the hole. Shortly thereafter, inmates from Gallery A were able to begin crossing into Gallery B. (Filing No. 90-3 at CM/ECF p. 2, ¶ 10.)

13.     At approximately 3:30 p.m., the fires that started earlier in Galleries A and B spread such that smoke began to fill the Gallery AB control station. Among the TSCI staff present in the Gallery AB control station at that time were Guiffre, Case Workers Steele and Thompkins, and Corrections Officer Roede. At roughly 3:40 p.m., the staff in the Gallery AB control station signaled duress and were given clearance to evacuate the control station. At that time, central control authorized group access for the cells in Galleries A and B, signaling the inmates in those cells to exit their cells and evacuate. Additionally, an announcement was made on the public address system for inmates to evacuate to the miniyards. (Filing No. 90-2 at CM/ECF p. 3, ¶ 11; Filing No. 90-3 at CM/ECF p. 3, ¶ 11.)

14.     The staff from the Gallery AB control station, including Guiffre, evacuated to the Gallery CD control station. Guiffre observed thick smoke throughout the cell areas and inside the control station itself. (Filing No. 90-2 at CM/ECF p. 3, ¶ 12; Filing No. 90-3 at CM/ECF p. 3, ¶ 12.)

15.     Because of the smoke filling Galleries C and D, the primary concern of Guiffre and the staff group with her at that point was that the inmates still secured in those galleries would be trapped in their cells. They accordingly radioed central control and advised them of the situation. They were again instructed by central control to signal duress and evacuate the Gallery CD control station. Simultaneously, central control authorized group access for the cells in Galleries C and D, signaling the inmates in those cells to exit their cells and evacuate to the miniyard shared by Galleries C and D. Additionally, an announcement was made on the public address system for inmates to evacuate to the miniyards. (Filing No. 90-2 at CM/ECF p. 3, ¶ 12; Filing No. 90-3 at CM/ECF p. 3, ¶ 13.)

16.     At this point, Guerry's cell door was unlocked and he successfully exited his cell. (Filing No. 1 at CM/ECF p. 4, ¶¶ II(B)(10-11); Filing No. 36 at CM/ECF p. 4, ¶¶ 14-15.)

17.     Guerry proceeded to an open door providing him access to an outside yard (i.e., the Gallery CD Miniyard), but declined to utilize this exit provided to him. (Filing No. 1 at CM/ECF p. 5, ¶¶ II(B)(21-22); Filing No. 36 at CM/ECF p. 6, ¶¶ 14-15.)

18.     At approximately 4:00 p.m., Guiffre and her staff group were advised by central control to go to the main lobby of Housing Unit 2 and occupy the main case worker office. They proceeded there after arming themselves with mop sticks and portable radios. When they reached the office, they barricaded the door with desks and filing cabinets to prevent entry by violent inmates. They waited in the office approximately one and a half hours until the special response team arrived to secure them. Guiffre's best recollection is that they were secured at approximately 5:30 p.m. (Filing No. 90-3 at CM/ECF p. 3, ¶ 14.)

19.     Under optimal (i.e., non-riot or disturbance) conditions, the fire evacuation procedure on May 10, 2015 called for Housing Unit 2 Gallery C and D inmates to be evacuated as follows:

a.      Gallery C inmates would be divided and escorted by facility staff to both the Gallery C Miniyard and the Gallery CD Miniyard.

b.      Gallery D inmates would be evacuated to the main yard (i.e., the common space at the center of the facility grounds unsubdivided by fencing as are the miniyards).

The rationale for these preferred evacuation paths is twofold. First, the Gallery C Miniyard is of insufficient size for all of the Inmates of Gallery C. Thus, additional space is needed to accommodate all of them in the event of an evacuation. Moreover, at that time, Gallery C housed protective custody inmates, including Guerry, whereas Gallery D housed general population inmates. Under optimal conditions, TSCI staff aim to keep protective custody inmates physically separated from general population inmates to the extent possible. Accordingly, by evacuating Gallery C inmates to both miniyards and Gallery D inmates to the main yard, the twin goals of inmate separation and adequate evacuation space are served. (Filing No. 90-2 at CM/ECF pp. 3-4, ¶ 13.)

20.     Conditions during the disturbance on May 10, 2015, however, were far from optimal. At the time of the Gallery CD evacuation, several factors rendered execution of the normal evacuation protocol impossible. These factors included:

a.      Numerous unsecured inmates were in the main yard. Several had armed themselves with makeshift weapons, had started fires, or were fighting. Evacuating additional inmates out of a housing unit and into the main yard could have exacerbated the

situation in the main yard and placed additional inmates and staff at risk. This meant the only available external evacuation option for Gallery D inmates was the Gallery CD Miniyard.

b.       Staff resources across the facility were extremely strained. Due to the risks posed to them by rioting inmates (some armed), the staff group in the Gallery CD control station ultimately evacuated from that location to a caseworker office inside Housing Unit 2. After barricading themselves in that office with desks and other furniture, they remained there until approximately 5:30 p.m. when they were secured by a special response team. This meant that the Housing Unit 2 staff were unable to effectively escort inmates out of their housing galleries to their fire evacuation destinations. More specifically, it meant that staff were unavailable at that time to supervise the inmates being evacuated into the Gallery CD Miniyard.

c.       Taking account of the foregoing factors in the context of reports that portions of Galleries C and D were filling with smoke, the collective determination of the command staff in central control was that the concern for acute inmate injury resulting from the smoke/fires outweighed the ordinary priority to keep protective custody inmates physically separate from the general population. Accordingly, the inmates in both Galleries were given group access and advised to evacuate to the Gallery CD Miniyard, a location large enough to accommodate the inmates of both Galleries simultaneously and guaranteed to serve as refuge from the smoke in Housing Unit 2.

d.       While command staff was cognizant of the fact that protective custody and general population inmates would be intermingled and unsupervised until they could be secured, the collective

judgment was that it was more important at that juncture to give inmates inside the housing unit who felt they were at risk from the smoke the option to evacuate to a location that would be safe from that particular harm.

(Filing No. 90-2 at CM/ECF pp. 4-5, ¶ 14.)

21.    The inmate violence and rioting described above continued across the facility throughout the afternoon and evening of May 10, 2015. As late as 1:00 a.m. on May 11, 2015, special response team personnel were restraining rioting inmates on the main TSCI yard. Accordingly, it was not until between approximately 1:00 a.m. and 1:30 a.m. that special response personnel were able to reenter Housing Unit 2 and secure inmates who remained inside. (Filing No. 90-2 at CM/ECF p. 5, ¶ 15.)

22.    At all times during the May 10-11, 2015, disturbance, NDCS personnel prioritized inmate and staff safety as they secured the TSCI facility under extraordinarily challenging conditions. (Filing No. 90-2 at CM/ECF p. 6, ¶ 16.)

23.    Guiffre returned to work later on the evening of May 10, 2015. Her assignment remained Housing Unit 2, Gallery C, for at least the next several weeks. For significant periods of that time, inmate movement within the facility was extremely limited for security reasons. Many inmates made requests to visit TSCI medical facilities for various reasons, including smoke inhalation. Due to high demand on limited resources, those inmates suffering acute medical distress were the priority for medical evaluations. However, medical personnel made regular rounds throughout the facility, including Gallery C. In the event an inmate was in need of immediate medical attention, that inmate would have been transported to the TSCI medical facility immediately. Guiffre has no specific recollection of Guerry making a request to her for medical treatment, but based on her knowledge of conditions and operations in Gallery C at the time, she is

confident that if he had required immediate medical attention, he would have received it. ([Filing No. 90-3 at CM/ECF pp. 3-4](), ¶ 15.)

24.     Broadfoot was employed as Unit Manager of Housing Unit 2 at TSCI on May 10, 2015. ([Filing No. 90-4 at CM/ECF p. 1](), ¶ 2.)

25.     Broadfoot was present in a supervisory capacity at Housing Unit 2 on May 10, 2015 and consistently during the week that followed. ([Filing No. 90-4 at CM/ECF pp. 1-2](), ¶ 3.)

26.     Broadfoot is familiar with what transpired within Housing Unit 2 during and after the inmate disturbance and, more specifically, is familiar with the staff response to the violence and disorder within Housing Unit 2, the steps that were taken to secure Housing Unit 2, and the facility cleanup and restoration activities undertaken in the hours and days that followed the May 10, 2015, disturbance. Broadfoot is familiar with the steps taken by TSCI staff to ensure the health and safety of the Housing Unit 2 inmates following the disturbance and personally participated in directing staff during the cleanup process. ([Filing No. 90-4 at CM/ECF pp. 1-2](), ¶¶ 3, 5.)

27.     Immediately after Housing Unit 2 was secured, portions of its ground floor (including cells) were covered by several inches of water from the fire sprinkler system. ([Filing No. 90-4 at CM/ECF p. 2](), ¶ 5.)

28.     Removal of this water was an immediate priority after Housing Unit 2 was secured. Within four to five hours of the building being secured, the water level was reduced from several inches to approximately one-half inch or less. The remaining water and any contaminants it contained were drained and cleaned up in Housing Unit 2 absolutely no later than 24 to 48 hours after the disturbance ended, to the best of Broadfoot's recollection. ([Filing No. 90-4 at CM/ECF p. 2](), ¶ 5.)

29.     Some cells and inmate bedding sustained damage during the disturbance, both from water and directly from rioting, sheltering, and injured inmates. (Filing No. 90-4 at CM/ECF p. 2, ¶ 6.)

30.     Broadfoot does not specifically recall whether and to what extent Guerry's cell was damaged, nor does he recall the condition of his bedding after the disturbance. However, TSCI staff were aware of the damaged bedding problem and, like the water removal, made it an immediate priority to replace the bedding in all Housing Unit 2 cells. (Filing No. 90-4 at CM/ECF p. 2, ¶ 6.)

31.     Guerry's bedding was replaced as quickly as possible after fresh linens were delivered in bulk to Housing Unit 2 and in no event as late as 4 days after Housing Unit 2 was secured. (Filing No. 90-4 at CM/ECF p. 2, ¶ 6.)

32.     Guerry suffered no discernible injury attributable to the foregoing events. (*See generally* Filing No. 90-5.)

33.     Based on Guerry's NDCS Chronological Record of Medical Care, on May 26, 2015, a nurse on rounds in Guerry's housing unit made an entry to record her encounter with Guerry in his cell, during which he complained of shortness of breath and dizziness. The record indicates that at that time Guerry had no difficulty ambulating and no noted difficulty breathing. He was instructed to increase his fluid intake. (Filing No. 90-5 at CM/ECF p. 2, ¶ 6.)

34.     On June 2, 2015, the record indicates that Guerry was again complaining of shortness of breath. Kristalaine Galatas ("Galatas"), a Certified Physician Assistant at TSCI, gave a verbal order for Guerry to be examined and evaluated for further treatment if necessary at the TSCI Medical facility. (Filing No. 90-5 at CM/ECF pp. 1, 2, ¶¶ 2, 7.)

35.     On June 3, 2015, Galatas examined Guerry. His vital signs were 136/90, his heart rate was normal, his body temperature was normal, his saturation

of oxygen was 98% (which is nearly perfect, with 100% being perfect and saturation of less than 90% being levels of concern). Guerry reported during this evaluation that "when he gets up he is dizzy." He also stated that he was short on breath with activity and not at rest. On physical examination, his lungs were clear to auscultation bilaterally. His heart sounds were normal. Orthostatic vital signs (i.e., vital signs on standing up) were taken to evaluate possible causes for his dizziness complaint and did not show a drop in blood pressure. He then was walked in the medical hallway at a rapid pace with pre-exercise oxygen saturation of 97% on room air (normal) and a heart rate of 81 beats per minute. Immediately after the exercise his oxygen saturation was again 97% and his heart rate was 96 beats per minute. His orthostatic vital signs and his oxygenation did not indicate a cause for complaints of dizziness or shortness of breath on exertion. Based on Galatas' medical experience, had Guerry been suffering from a pulmonary issue at the time of this evaluation, his oxygen saturation likely would have dropped and his heart rate would have increased to compensate for a lack of oxygen. No signs of lung damage were found on interview, physical examination, or exertional pulse oximetry testing. (Filing No. 90-5 at CM/ECF pp. 2-3, ¶ 8.)

36.     Guerry was in no distress based on these vital signs. His evaluation on June 3, 2015, revealed no signs of smoke inhalation such as cough, hoarseness, chest pain, coughing up blood, trouble breathing (such as increased respiratory rate or noisy breathing), headache, abdominal pain, nausea, eye irritation, or vision problems. Galatas' examination notes reveal normal male exam findings. (Filing No. 90-5 at CM/ECF p. 3, ¶ 9.)

37.     During the June 3, 2015, examination, Galatas ordered a chest x-ray. At that time, TSCI medical personnel were ordering chest x-rays of all inmates complaining of smoke inhalation as a result of the fires on May 10, 2015. The

report of that chest x-ray was verified on June 5, 2015.[11] Its findings were that Guerry's lungs were normal. According to Galatas, had Guerry suffered lung damage from smoke inhalation, it is extremely likely that the x-ray report would have provided indication of such damage. (Filing No. 90-5 at CM/ECF p. 3, ¶ 10.)

38.     During the June 3, 2015, examination, Galatas also ordered a fasting blood chemistry panel in order to rule out a blood electrolyte problem that could have caused Guerry's complaint of dizziness. On June 16, 2015, the lab work on the blood draw was evaluated by Galatas and was found to be normal with the exception of elevated triglycerides which is a blood fat unrelated to smoke inhalation. Galatas prescribed him medication to address this issue and he was entered in the Chronic Care Clinic and scheduled for a visit with a medical doctor for further care. (Filing No. 90-5 at CM/ECF p. 3, ¶ 11.)

39.     Galatas ordered that Guerry's complaints of dizziness and shortness of breath be further evaluated by a Psychiatric consult, in regards to probable panic and/or anxiety episodes. Panic/anxiety symptoms include dizziness and shortness of breath. Additionally, being in a prone position for lengthy periods and moving suddenly to an upright position can cause symptoms of dizziness. (Filing No. 90-5 at CM/ECF p. 3, ¶ 12.)

40.     On June 22, 2015, Galatas saw Guerry once more so that she could inform him of his lab results and advise him of dietary changes and new medication (this visit was unrelated to his previous complaints). His vital signs at that time were a normal heart rate of 70 beats per minute, normal temperature, and oxygen saturation of 98%. He did not report further dizziness or difficulty breathing on this visit. (Filing No. 90-5 at CM/ECF pp. 3-4, ¶ 13.)

_____

[11] The verification of the x-ray report is included at the last page of Exhibit 1 to Galatas' Declaration. (Filing No. 90-5 at CM/ECF p. 8.)

# III.  ANALYSIS

## A.  Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotations omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

**B. Qualified Immunity**

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id*.

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id*. "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

**C. Eighth Amendment Claims**

**1. Failure to Protect**

The court determined that Guerry had stated plausible Eighth Amendment failure-to-protect claims against all Defendants *except* Broadfoot and Holley by alleging that Defendants failed to protect him from gangs and fires during the May

10, 2015, TSCI prison riot. (Filing No. 76 at CM/ECF p. 5; Filing No. 85 at CM/ECF p. 2.)

"The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296 (1991)). In order to make out an Eighth Amendment violation, "the offending conduct must be wanton." *Id.* (quoting *Wilson*, 501 U.S. at 302 (emphasis in the original)). "The word 'wanton[] does not have a fixed meaning' and its meaning in the Eighth Amendment context depends upon the circumstances in which the alleged violation occurs." *Id.* (quoting *Wilson*, 501 U.S. at 302). "In cases involving prison riots, for example, wantonness is demonstrated by acting 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). "The Eighth Amendment standard for conditions of confinement and medical care . . . is different, and the constitutional question in [such] case[s] is whether [the defendant] acted with 'deliberate indifference.'" *Id.* (citing *Wilson*, 501 U.S. at 303).

"It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause [of the Eighth Amendment], whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley*, 475 U.S. at 319. "[P]rison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the 'obligation to take reasonable measures to guarantee the safety of the inmates themselves.' In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 320 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

The Supreme Court has cautioned that substantial deference must be afforded to prison staff when they are addressing matters of institutional safety and security. *Whitley*, 475 U.S. at 321-22. As the Court explained:

> When the ever-present potential for violent confrontation and conflagration ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight. Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id.* (internal citations and quotation marks omitted).

Defendants' undisputed evidence establishes that Guiffre and her staff group were required for their own safety to evacuate the control center after fires were started in Housing Unit 2, and that special responders were dispatched to the prison to quell the rioting. The evidence also shows that when Guiffre and the other staff who were in the Gallery CD control center observed smoke filling both the cell areas in Galleries C and D and the control center itself, their primary concern was that the inmates who were secured in those galleries, including Guerry, would be trapped in their cells. Therefore, before Guiffre and the staff evacuated the control center, they advised central control of the threat to the inmates and ensured that the inmates were able, and instructed, to exit their cells and evacuate to the outside.

According to Guerry's allegations, Defendants left him with a "Hobson's Choice" when they opened the door to the yard with general population inmates:

he could lock himself in his cell to avoid another assault from gang members amongst the general population inmates but risk smoke inhalation. Alternatively, he could exit his cell to avoid the smoke inhalation but risk another assault from gang members amongst the general population inmates. Guerry's allegations suggest that, in order to protect his health and safety, all Defendants had to do was open the door to the "small" yard instead of the "bigger" yard. The evidence, however, demonstrates that the normal evacuation procedures could not be carried out under the rioting conditions, and that any "Hobson's Choice" was due to the emergency situation created by the rioting prisoners and fires and not due to the sadistic or malicious intent of any of the Defendants. Normally, Gallery C protective custody inmates would be divided and escorted to both the Gallery C Miniyard and the Gallery CD Miniyard, while general population inmates in Gallery D would be taken to the main yard. On May 10, 2015, however, it was not possible to adhere to this protocol. Specifically, at the time Gallery C was evacuated, there were unsecured, rioting inmates in the main yard and evacuating additional inmates to that area could have exacerbated the problem. Staff resources facility-wide (and particularly in Housing Unit 2) were extremely strained, rendering the usual inmate evacuation escorts impossible. Under these difficult circumstances, TSCI staff determined that the concern for acute inmate injury from the smoke and fires took precedence over the potential problem of mixing general population and protective custody inmates. Accordingly, the protective custody inmates in Gallery C and the general population inmates in Gallery D were evacuated to a location guaranteed to accommodate all of them simultaneously outside the building, secure from the main yard where prisoners were rioting and safe from smoke and flame. The evidence thus establishes that the decision to evacuate protective custody and general population inmates to the same location was not motivated by any desire to allow general population inmates to "prey" on protective custody inmates.

Nor is there any evidence that Defendants intentionally delayed Guerry's rescue in the face of rioting prisoners and fires. Because the Housing Unit 2 staff was forced to barricade themselves for safety, other responders were necessary to

secure the inmates who remained inside the housing unit, including Guerry. Inmate violence and rioting continued across TSCI throughout the afternoon and evening of May 10, 2015, and it was not until after 1:00 a.m. on May 11, 2015, that special response teams were able to reenter Housing Unit 2 and secure those inmates. To the extent Guerry alleges that TSCI was understaffed, Defendants' evidence shows that TSCI's minimum staffing requirements were being met on May 10, 2015, when the riot broke out. Thus, the evidence demonstrates that there was no malicious or sadistic motive on the part of any of the Defendants that caused Guerry to await rescue for approximately ten hours.

With respect to Thompson, the evidence establishes that he did not have any responsibility whatsoever for Guerry's safety and security on the day of the riot. Thompson was not scheduled to work at TSCI on May 10, 2015; he was not present at the facility that day; and he was not among the correctional officers who were involved with, or who responded to, the inmate disturbance on May 10, 2015. Therefore, Thompson cannot be liable to Guerry for any failure to protect him from gangs and fires during the prison riot.

Because there is no evidence that any of the Defendants were deliberately indifferent to Guerry's health and safety, let alone that they acted "maliciously and sadistically for the very purpose of causing harm" while the prison riot was in progress, they are entitled to qualified immunity. *See Clayborne v. Frakes*, No. 8:15CV198, 2016 WL 6462266, at *4 (D. Neb. Oct. 27, 2016), *aff'd sub nom. Clayborne v. Tecumseh Dep't of Corr.*, 699 F. App'x 593 (8th Cir. 2017).

### 2. Conditions of Confinement

The court also determined that Guerry had stated plausible Eighth Amendment conditions-of-confinement claims against all Defendants based on the condition of his cell following the May 10, 2015, riot. (Filing No. 76 at CM/ECF p. 5; Filing No. 85 at CM/ECF p. 2.)

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008) (citation omitted).

To establish an Eighth Amendment conditions-of-confinement claim, Guerry must show that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957 (8th Cir. 1994) (quoting *Wilson*, 501 U.S. at 304).

According to Guerry, Defendants failed to move him out of his cell where he was exposed to burning plastic, oily water contaminated with blood, human waste, and sewage for four or more days following the prison riot. He asserts that his blankets, sheets, and bed contained blood of another inmate for a similar amount of time. He alleges that he had to eat and sleep in those conditions. With respect to sanitation, the Eighth Circuit focuses on "the length of exposure to unsanitary conditions and how unsanitary the conditions were." *Owens v. Scott Cnty. Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003).

In *Whitnack*, two inmates (one was a pretrial detainee) claimed unconstitutional conditions of confinement after they were placed in a cell with

paper, food and other "stuff" on the floor, together with hair, dried "mucus, spit, [and] vomit" in the sink and "dried human waste" on the toilet seat. 16 F.3d at 956. The court first noted that the Constitution "does not mandate comfortable prisons," and that conditions of confinement are considered cruel and unusual punishment "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Id.* at 957 (quoting *Wilson*, 501 U.S. at 304). The court also stated that the length of time during which the inmates were confined in the cell often governs whether the conditions were cruel and unusual, noting that the plaintiffs were provided with cleaning supplies within twenty-four hours of their placement in the cell. The court referred to other cases which found that inmates who were placed in dirty cells for short periods of time were not subjected to cruel and unusual punishment. *Id.* at 958 (citing *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (an inmate confined to an unsanitary cell for eleven days did not prove a constitutional violation because of the "relative brevity" of his stay), and *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (plaintiff spent five days in a filthy, roach-infested cell without toilet paper, which was held not to be unconstitutional)). *See also Goldman v. Forbus*, 17 F. App'x 487, 488, 2001 WL 838997 (8th Cir. 2001) (unpublished per curiam) (no constitutional violation where pretrial detainee slept six nights on floor next to toilet); *Smith*, 87 F.3d at 267 (no constitutional violation occurred when a pretrial detainee was confined in a cell with an overflowed toilet for four days); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) ("Conditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)). In concluding that the plaintiffs' evidence was insufficient to prove a deprivation of their constitutional rights, the court noted that the record failed "to show that the conditions were of any proven adverse consequence to the health or other basic human needs of the plaintiffs, given the brevity of their confinement." *Whitnack*, 16 F.3d at 958.

Based on all these decisions, the court finds that the evidence here does not support a constitutional claim for relief. As an initial matter, the unsanitary cell

conditions were caused by extenuating circumstances—the rioting inmates and fires—and not prison staff. The evidence shows that TSCI staff endeavored to clean up the damage and unsanitary condition as quickly as possible with the resources available to them. Although the court does not doubt that the unsanitary conditions of Guerry's cell were patently offensive to see and to smell and made it difficult to eat and sleep, Guerry cannot carry his burden of proof simply by putting on evidence that he was offended or briefly made uncomfortable by the generally unclean and decidedly unpleasant overall conditions of the cell. *See Whitnack*, 16 F.3d at 958. The record fails to show that the conditions were of any proven adverse consequence to Guerry's health. *See id.* The evidence also does not show that Guerry was deprived of a single human need during the days he spent in the unsanitary cell. Finally, the evidence establishes that the unsanitary conditions lasted no more than four days, which the courts have found to be "tolerable." *See Howard*, 887 F.2d at 137.

Therefore, the court finds that the undisputed evidence does not establish an Eighth Amendment conditions-of-confinement claim.

IT IS THEREFORE ORDERED that:

1.     Defendants' Motion for Summary Judgment (Filing No. 88, Case No. 8:15CV323; Filing Nos. 41, 46, Case No. 4:17CV3047) is granted.

2.     A separate judgment will be entered.

Dated this 6th day of April, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge